IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JIMMY LEE WHITMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:13-cv-0017-TFM |
| ) | [wo] |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

In January 2010, Jimmy Lee Whitman ("Plaintiff" or "Whitman") applied for supplemental security income under Title XVI and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act").  After being denied, Whitman timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on August 16, 2011  (Tr. 7-28).  The Appeals Council denied Plaintiff's request for review on November 6, 2012.  (Tr. 1-6).  As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").  *Id.*  Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c).  After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

### I.  NATURE OF THE CASE

Whitman seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits.  United States District Courts may conduct

limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The Court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla ─ i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v.*

*Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence."*Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. §

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

---

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404 Subpt. P, App.1?[3]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id*. at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert ("VE").  *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*.

### IV.  ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Plaintiff was 43 years old on his alleged onset date and was 45 at the time of the ALJ's decision.  (Tr. 143).  On his disability report, Plaintiff stated that he had a ninth grade education, that he did not attend special education classes, and that he could read and understand English and write more than his name in English.  (Tr. 170, 172).  However, at the evidentiary hearing Whitman testified that he could not read or write, that he failed the Sixth grade at least once with all failing grades in all subjects, and that he was 13 years and 7 months old when he dropped out of school.  (Tr. 52)  He further testified that he was placed in special education classes in Clanton, Alabama.  (Tr. 53).

School records from 1975 to 1980, show that in the 1975 to 1976 school year, Plaintiff received satisfactory grades in all subject areas and had 55 days of unexcused

---

4 *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

absences out of 185 days. In the 1976 to 1977 school year, Plaintiff failed every subject, but had 118 unexcused absences. In the 1977 to 1978 school year, Plaintiff had only 22 days unexcused absences and his grades ranged from an F in spelling to a B in physical education. The rest of his grades were C's and D's. In the 1978 to 1979 school year, Plaintiff had 44 unexcused absences out of 180 days and failed all of his classes. Plaintiff's teachers remarked that Plaintiff needed to stay in school so he could "improve in his studies". (Tr. 232-34). In 1997, testing demonstrated that he was in the "low" range (0-15 national percentile) academically in reading, math, language, and spelling. (Tr. 245). Between late 1978 and early 1980, Plaintiff was suspended from school nine times for misbehavior including fighting with other students, playing with matches, smoking, and disrupting class. (Tr. 235-44).

      Plaintiff has past work experience as a loader/operator, skidder operator, dump truck driver, and logger. (Tr. 56-57, 173). Whitman testified at the hearing that he had a commercial driver's license. (Tr. 35). At the hearing he also described handling money on his own during times when he was working away from home. (Tr. 40-41). He testified that he had taken out loans from the bank for big purchases such as motorcycles and cars. (Tr. 45). Plaintiff discussed the details of his work injury in 1985 and subsequent rehabilitation. (Tr. 46-49). Plaintiff also testified that he has had difficulty dealing with his marital separation and said that when his wife left him he was drinking 30 to 40 beers a day. (Tr. 50). He reported that he always had difficulty in school, but stated that he did not think he was mentally retarded. (Tr. 68).

The ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security law. (Tr. 8-25). In reaching his disability determination, the ALJ identified multiple severe medical impairments including borderline intellectual functioning, major depressive disorder, alcohol abuse disorder, chest pain of uncertain etiology and status post multiple injuries from 1985 with residual chronic back pain. (Tr. 13). The ALJ ruled that the plaintiff, in spite of these severe impairments, could perform his past relevant work as a loader operator, skidder operator and dump truck driver. (Tr. 24). The ALJ concluded that Plaintiff could not, however, perform his past relevant work as a logger, because this work was performed at the "heavy exertional level". (Tr. 24). In reaching his conclusion, the ALJ specifically addressed the issue of whether the plaintiff's medical or psychological problems satisfied the criteria of any of the "Listings" found in the "Listing of Impairments" in order to establish presumptive disability under 20 C.F.R. 404.1525, Appendix 1, 12.02, 12.04 and 12.05. (Tr. 16).

## V. MEDICAL HISTORY

In January 2010, Plaintiff presented to the emergency room complaining of pelvic pain resulting from his fall down the stairs a few days earlier. Plaintiff reported a past history of a broken pelvis, back and neck. Plaintiff's affect, behavior, and communication were noted to be within normal limits. (Tr. 251). X-rays of the right femur and hip showed no fracture, dislocation, or other acute abnormality. (Tr. 258). He was diagnosed with right hip contusion. (Tr. 253).

In March 2010, Hirenkumar M. Jani, M.D., examined Plaintiff in connection with his application for benefits. Plaintiff reported he had injured his back in an accident at

work in 1985, and had to undergo physical therapy to ambulate independently. He rated his pain as eight out of ten and said that sitting and riding increased his pain. He stated he used a transcutaneous electrical nerve "TENS" machine that he had borrowed. (Tr. 260). Plaintiff's physical examination showed negative straight leg raising tests, full muscle strength, and normal sensation and reflexes. Dr. Jani assessed chronic back pain and opined Plaintiff could lift and carry 100 pounds occasionally and 50 pounds frequently and had no other restrictions. (Tr. 262).

In December 2010, Plaintiff presented to the nurse practitioner complaining of chest pain for the past month. Plaintiff's blood pressure was elevated. He was advised to go to the emergency room. (Tr. 283). On February 2011, Plaintiff consulted with Dr. Eric Crum, a cardiologist, for evaluation of chest pain and shortness of breath. Plaintiff reported left-sided chest soreness that was not exertional and that had been constant for at least a month. He also reported left arm numbness and an episode of palpitations. (Tr. 293). Plaintiff explained that he smoked, drank a 12 pack of beer every day, and did not exercise. (Tr. 294). Plaintiff complained of depression, anxiety, and not sleeping at night, but denied memory loss and confusion. (Tr. 296). Dr. Crum assessed atypical chest pain with multiple coronary artery disease risk factors, dyspnea on exertion with long history of tobacco abuse and probable chronic obstructive pulmonary disease, high blood pressure, high cholesterol, alcohol and tobacco abuse, remote history of ulcers, history of arthritis, and history of trauma with a tree falling on him in 1985. (Tr. 297-98). Dr. Crum scheduled diagnostic testing, and counseled Plaintiff to stop smoking. (Tr. 298).

Emergency room treatment notes dated March 5, 2011 show Plaintiff reported he had been having chest pain that had started three hours earlier and that he had been having chest pain on and off for a year. (Tr. 273). On examination, Plaintiff was fully oriented and had a normal mood and affect and normal strength and sensation. (Tr. 274). Plaintiff underwent cardiac catheterization on March 22, 2011, which showed normal coronary function with arteries of normal ventricular size, moderately elevated left ventricular end diastolic pressure, and no significant mitral regurgitation. Dr. Crum concluded Plaintiff's chest pain appeared to be noncardiac. He planned vigorous risk factor modification and consideration of noncardiac causes of chest discomfort. (Tr. 316).

On March 31, 2011, Donald W. Blanton, Ph.D., examined Plaintiff at the request of his attorney. Plaintiff reported that after his accident in 1985, he recovered and was able to work, but that he had experienced an increase in pain over the past few years. (Tr. 321). Plaintiff also complained of chest pain, depression, high blood pressure, and asthma. (Tr. 321). Plaintiff admitted that he abused alcohol for 25 years, drinking 30 to 40 beers a day, and a pint of whiskey each day, but reported that he currently drank only once or twice a week and usually less than six beers at a time.

Dr. Blanton conducted a mental status examination and interview with Whitman and administered to him the Wechsler Adult Intelligence Scale-IV ("WAIS –IV") and a Wide Range Achievement Test (Revised III). (Tr. 323). On the WAIS– IV, Mr. Whitman scored a Verbal Comprehension Index of 61, a Perceptual Reasoning Index of 72, a Working Memory Index of 60, a Processing Speed Index of 62 and a full scale IQ of

58.  (Tr. 323).  The scores on the Wide Range Achievement Test demonstrate that Plaintiff is reading at at first grade level, spelling at a first grade level, and performing arithmetic at a second grade level.  (Tr. 323).  Dr. Blanton stated that the administration of the Minnesota Multiphasic Personality Inventory was omitted due to a combination of plaintiff's low intellect and his poor reading ability.  (Tr. 324).

Dr. Blanton also commented that the score on the WAIS-IV was considered to be "valid" and that the scores " . . . may represent a drop in his intellect over time due to his alcohol abuse." (Tr. 324).  However, Dr. Blanton further stated that in his opinion Plaintiff "would likely have been functionally illiterate throughout his lifetime and likely [had] a very low intellect even before his alcohol abuse."  (Tr. 324).  Based on school records and psychmetric testing, Dr. Blanton diagnosed "mild mental retardation" (Tr. 324).  Dr. Blanton stated

> "[i]t is my opinion that [Plaintiff's] intellect has been at this present level for atleast five years and perhaps throughout his life-time.  It is my opinion that his anxiety and depression problems have been present at this level for at least one year.  He is also likely to deteriorate emotionally if he is placed under stress, especially that of a job."

(Tr. 325).  Dr. Blanton also identified significant functional restrictions on Plaintiff's ability to maintain attention and concentration and pace for at least two hours and to respond to customary work pressures.  (Tr. 325).

## VI.  Issues

Whitman raises two issues for judicial review:

(1) Whether the evidence of record establishes that the Plaintiff is presumptively disabled under 12.05 (B) of the "Listing of Impairments"?

(2) Whether there is credible evidence in the record upon which the ALJ could rely to substantiate his conclusions that the Plaintiff is functioning intellectually in the borderline range?

## VII.  ANALYSIS

Plaintiff argues on the basis of his past school records and the diagnosis made by Dr. Blanton that he suffers from "mild mental retardation" [Tr. 324], that the record evidence establishes that he is presumptively disabled under 12.05 (B).  In general, a claimant meets the criteria for "presumptive disability" under Listing 12.05 B by presenting a valid IQ score of 59 or less as well as evidence of an additional mental or physical impairment significantly affecting the claimant's ability to work.  *Crayton v. Callahan,* 120 F. 3d 1217, 1219-20 (11th Cir. 1997).  Here, the ALJ recognized that Plaintiff received a full scale IQ score of 58 at Dr. Blanton's examination in March 2011, and that Dr. Blanton diagnosed Plaintiff with mild mental retardation.  (Tr. 18, 323).  The ALJ concluded, however, that Plaintiff functioned in the borderline intellectual functioning range given his level of adaptive functioning skills.  (Tr. 13, 18-21).  The *Diagnostic and Statistical Manual of Mental Disorders - Text Revision (DSM-TR)* states as follows:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criteria A) that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criteria B). The onset must occur before age 18 years. (Criteria C).

*DSM-TR* at 39.

Indeed, the ALJ recognized that Plaintiff had a fairly consistent work history, working in the logging industry in different semi-skilled positions. (Tr. 20). The ALJ discussed the vocational expert's testimony that these jobs involved the operation of expensive and dangerous equipment and that the vocational expert did not think a mentally retarded person could have performed those jobs. (Tr. 20, 58-60). The ALJ also pointed out that Plaintiff's earnings were performed at the substantial gainful activity level for many years between 1987 and 2009 and represented a significant level of adaptive functioning over an extended period of time. (Tr. 20, 161).

The ALJ also discussed Plaintiff's academic history, and acknowledged that Plaintiff's school records reflected poor and failing grades and that he dropped out of school. (Tr. 18-19, 232-45). However, the ALJ closely examined the Plaintiff's school records and concluded that Plaintiff's poor academic performance was related, at least in part, to his frequent unexcused absences. (Tr. 18). For example, for the 1976-1977 school year, Plaintiff had 118 unexcused absences and flunked every subject and in the 1978 to 1979 school year, Plaintiff had 44 unexcused absences and again flunked all his classes. But in the 1977 to 1978 school year, Plaintiff had only 22 unexcused absences and received mostly passing grades. Indeed, Plaintiff's teachers noted that Plaintiff needed to attend school to improve his grades. (Tr. 232). The ALJ also concluded that Plaintiff's numerous suspensions seemed to affect his school performance. (Tr. 18-19). Indeed, in the school year that Plaintiff received mostly passing grades, there were no suspensions, but in the next two school years, when Plaintiff flunked all his classes, he received nine suspensions. (Tr. 235-44).

The ALJ also discussed Plaintiff's activities of daily living, which had included caring for himself, handling money, traveling for work, shopping, and even obtaining loans to finance large purchases. (Tr. 21, 40-41, 45, 193). Plaintiff also had obtained a commercial driver's license (Tr. 35), which as the ALJ noted (Tr. 20), involved passing a test and required the ability to read English sufficiently to understand traffic signs and signals and to make entries on reports and records. *See* 49 C.F.R § 391.11(b)(2) (requiring drivers of commercial motor vehicles to be proficient in English). Notably, Plaintiff, himself, testified at the hearing that he did not believe he is mentally retarded. (Tr. 68).

The ALJ also noted Plaintiff, who completed his own function report, stated he had no trouble concentrating unless he was in severe pain and that he could follow written instructions "well." (Tr. 195-197). Thus the court concludes substantial evidence supports the ALJ's conclusion that Plaintiff failed to show sufficient limitations in adaptive functioning to meet Listing 12.05. *See, e.g., Harris v. Comm'r of Soc. Sec.,* 330 F. App'x 813, 815 (11th Cir. 2009) (unpublished) (ALJ reasonably found that, although a claimant attended special education classes during school, he did not meet Listing 12.05 where he had held several jobs and could handle his own personal care.)

Plaintiff further argues that the ALJ erred in finding that he had borderline intellectual functioning, rather than mental retardation. (Pl. Br. at 10-12). The ALJ discounted Dr. Blanton's opinion that Plaintiff had mild mental retardation in concluding that Plaintiff had borderline intellectual functioning. (Tr. 24). Dr. Blanton, a psychologist, did not treat Plaintiff regularly; rather he met Plaintiff once for an

examination made in connection with Plaintiff's disability claim.  Thus, his opinion is not entitled to controlling weight.  *See* 20 C.F.R.§ 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)"); *Crawford v. Comm'r of Soc. Sec.,* 363 F. 3d 1155,1160 (11th Cir. 2004) (The rule giving "great weight" to a treating medical source's opinion does not apply where a medical source examined the claimant only one time.)

The ALJ considered and discussed Dr. Blanton's opinion but gave it "little weight" because it was not bolstered by the other evidence of record discussed more fully above. *See Schnorr v. Bowen,* 816 F.2d 578, 581 (11th Cir.1987) (good cause to discount physician's opinion exists when opinion not bolstered by other record evidence.) Furthermore, no other examining or treating physician noted any evidence of mental retardation.  Moreover, Plaintiff displayed logical thoughts and conversations, was consistently able to accurately describe his symptoms and report his medical history, and was consistently noted to have normal affect, behavior, and communication.  (Tr. 251, 260, 274, 279, 283, 293, 296, 347).  Accordingly, the court concludes that the ALJ's conclusion that Plaintiff does not meet 12.05B of the Listing of Impairments and has borderline intellectual functioning is supported by substantial evidence.  *Miles,* 84 F.3d at 1400.

## IX. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by

substantial evidence and proper application of the law.  It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate judgment is entered herewith.

DONE this 27th day of May, 2014.

>  /s/ Terry F. Moorer
>  TERRY F. MOORER
>  UNITED STATES MAGISTRATE JUDGE